UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

TIMOTHY MICHAEL PRENDERGAST,

      Petitioner,

v.                            Case No:  2:14-cv-619-FtM-38MRM

SECRETARY, DOC and FLORIDA
ATTORNEY GENERAL,

      Respondents.[1]

_____/

**OPINION AND ORDER[2]**

      This matter comes before the Court upon a petition for habeas corpus relief filed pursuant to 28 U.S.C. § 2254 by Timothy Michael Prendergast ("Petitioner").   Petitioner, through counsel, filed a memorandum and supplemental memorandum in support of the petition (Doc. 2; Doc. 10).   Petitioner attacks the conviction entered by the Twentieth Judicial Circuit Court in Lee County, Florida in 2008 for second degree murder (Doc. 1,

_____

[1]  When the petitioner is incarcerated and challenges his present physical confinement "the proper respondent is the warden of the facility where the prisoner is being held, not the Attorney General or some other remote supervisory official." *Rumsfeld v. Padilla*, 542 U.S. 426, 436 (2004)(citations omitted).   In Florida, the proper respondent in this action is the Secretary of the Florida Department of Corrections. Therefore, the Florida Attorney General will be dismissed from this action.

[2]  Disclaimer:   Documents filed in CM/ECF may contain hyperlinks to other documents or Web sites.   These hyperlinks are provided only for users' convenience. Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees. By allowing hyperlinks to other Web sites, this court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.   Likewise, the court has no agreements with any of these third parties or their Web sites.   The court accepts no responsibility for the availability or functionality of any hyperlink.   Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.

filed October 23, 2014).   Respondent moves to dismiss the petition as untimely filed (Doc. 15).   Petitioner filed a reply (Doc. 16).

Petitioner raises two claims in his petition.   Petitioner asserts that: (1) defense counsel was ineffective for failing to have Petitioner evaluated for competency prior to entering a plea; and (2) he was deprived of his constitutional due process rights because he was convicted and sentenced while incompetent (Doc. 1).   The Court cannot reach the merits of these claims because the pleadings, exhibits, and attachments before the Court establish that the petition should be dismissed as untimely and the claims as unexhausted. Alternatively, the Court concludes that the claims raised in the petition lack merit.

Because the Court may resolve the Petition on the basis of the record, an evidentiary hearing is not warranted.   *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) (if the record refutes the factual allegations in the petition or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing).

## I.     Background and Procedural History

Petitioner asserts that, after suffering from years of serious and chronic health problems, in December of 2006 he moved from Nevada to live with his parents in Lee County, Florida (Doc. 2 at 4-5).   On December 11, 2006, just prior to the move, he began taking Chantix, a smoking cessation medication, which was prescribed by a doctor in Nevada. *Id.* at 4.   Petitioner also asserts that this doctor "allowed [him] to be taking both Librium and Ativan at the same time when [the doctor] intended for [him] to be only taking Ativan." *Id.* at 6.

On March 27, 2007, Petitioner stabbed his father multiple times, "hours" after an altercation over Petitioner's unauthorized borrowing of money from his mother's purse (Doc. 2 at 6).   Petitioner's mother intervened, and told Petitioner to call the police. *Id.*

Petitioner did so, but told the dispatcher that somebody must have broken into his home and stabbed his father. *Id.*   Petitioner's father died as a result of the attack. *Id.*

On April 24, 2007, Petitioner was charged by information with second degree murder in violation of Florida Statute § 782.04(2) (count one) and with aggravated battery with a deadly weapon or causing harm in violation of Florida Statute § 784.045 (count two) (Ex. 1).[3]   On October 15, 2008, Petitioner entered a plea of no contest to count one in exchange for a sentence of fifteen years in prison followed by ten years of probation (Ex. 2; Ex. 3).   Judgment and sentence were entered on October 20, 2008 (Ex. 3).

On December 9, 2008, Petitioner filed a *pro se* motion for reduction or modification of sentence pursuant to Rule 3.800(c) of the Florida Rules of Criminal Procedure (Ex. 5). In the motion, Petitioner argued for a more lenient sentence on the ground that he suffered from various medical infirmities for which he took medication. *Id.*   Petitioner further argued that his use of these medications, particularly the anti-smoking medication Chantix, caused him to commit the crime to which he pleaded no contest:

> I have researched Librium, Adivan, and Chantix, and learnt that "Chantix" is actually an insecticide utilized as a medication when I began taking it, but it has since been receiving "national" attention as being the "cause" of hundreds of deaths, the FDA has received many complaints about it, the FDA currently has it listed as "Number 1" on their Black-List of Medications, and it has been learnt that the side-effects from taking "Cahntix" are: 1) impulsive behavior, 2) aggression, 3) suicidal tendencies, and 4) vivid dreams.   As should be apparent now, my being under the influence of medically prescribed Librium (25 mg. 3 per day), Adivan (1 mnr. 2X per day) and Chantix (1 mt. 1X per day), while on

---

[3]   Unless otherwise indicated, references to exhibits are to those filed by Respondent on May 4, 2015 (Doc. 18).   The pages of evidentiary hearing transcript, located in Petitioner's Exhibit D, will be referred to by Bates number at the bottom of the page and cited as (EH at ___).   The documents in Respondent's Exhibit 11 will be referred to by Bates number.

oxygen 24-7 and Nubulizer Treatment every 4-hours and coupled with my debilitated and diminished physical/medical condition would explain and "account for" even a physically healthy individual succumbing to an emotional and mental state wherein they would have unintentionally and unknowingly participated in such acts as I did.

I struggle daily in living with the life and circumstances that my actions stemming forth from being under the influence of these intoxicating, mind and mood-altering narcotics all at the same time has rendered me, and having conducted what limited research I have been enabled to since the day of those events that resulted in me taking the life of my very own father has served to some-what provide a sense of comfort and knowing that while it was "through I," it was not "I" that committed those acts, I believe the physician's error and those medications have resulted in me being as much a victim as my Dad, Mother, and the remainder of my family.

Your Honor, due to the fact my case was resolved through plea bargaining, naturally most of the specific and in depth facts herein and above disclosed were not made known to and considered previously by this court.  As may be recognized at this time presented are documented and evidenced facts that not only limit my culpability on the day of the incident, but also could have supported and established a viable defense at a trial.

(Ex. 5 at 8-9) (emphases in original).   On January 5, 2009, the trial court denied the

motion on the ground that it would "not reduce or modify a sentence imposed as part of

a negotiated plea agreement." (Ex. 7).

On October 14, 2009, Petitioner filed a motion for post-conviction relief pursuant

to Rule 3.850 of the Florida Rules of Criminal Procedure ("Rule 3.850 motion") (Ex. 8).

Petitioner voluntarily dismissed the motion (Ex. 9; Ex 10).   Subsequently, on November

10, 2010, Petitioner filed a second Rule 3.850 motion (Ex. 11 at 1-9, 23-58).   Petitioner

filed a third Rule 3.850 motion on November 25, 2011 in which he argued that his trial

counsel was ineffective for failing to conduct an adequate investigation into his involuntary

intoxication defense and requested to withdraw his plea on the ground that "newly

discovered evidence" proved that Chantix' side effects caused him to murder his father (Ex. 11 at 134-202).   After an evidentiary hearing, the post-conviction court denied relief (Ex. 11b; Ex. 11a at 357-65).   Florida's Second District Court of Appeal affirmed (Ex. 15); *Prendergast v. State*, 115 So. 3d 1010 (Fla. 2d DCA 2013).   Mandate issued on July 12, 2013 (Ex. 18).

Petitioner filed the instant habeas petition on October 23, 2014 (Doc. 1).

## II.   Analysis

### A.   A 28 U.S.C. § 2254 federal habeas corpus petition is subject to a one-year statute of limitation

Pursuant to the requirements set forth in 28 U.S.C. § 2244, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a one-year limitation period applies to the filing of a habeas petition by a person in custody pursuant to a state court judgment.   This limitation period runs from the latest of:

> (A)   the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B)   the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C)   the date on which the constitutional right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D)   the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).   Here, Petitioner does not allege, nor does it appear from the pleadings or record, that the statutory triggers set forth in §§ 2244(d)(1)(B)-(D) apply.

Therefore, the statute of limitations is measured from the remaining statutory trigger, which is the date on which Petitioner's conviction became final. 28 U.S.C. § 2244(d)(1)(A).

### 1. Petitioner's federal habeas corpus petition is untimely under *28 U.S.C. § 2244(d)(1)(A)*

Petitioner's plea based judgment was rendered on October 20, 2008 (Ex. 3). Petitioner did not appeal, and his judgment became final thirty days later. *See Bridges v. Johnson*, 284 F.3d 1201, 1202 (11th Cir. 2002) (holding that where a petitioner did not seek direct review of his judgment of conviction or sentence, his judgment of conviction (entered upon his guilty plea) became "final" for purposes of § 2244 on the date his 30–day right to appeal expired); *Hampton v. State*, 837 So.2d 611 (Fla. 5th DCA 2003) (when defendant did not directly appeal his conviction, the judgment and sentence became final 30 days after they were rendered); *Davis v. State*, 693 So.2d 700 (Fla. 2d DCA 1997) (judgment and sentence become final when 30–day period to file notice of appeal expires).   Accordingly, Petitioner's judgment became final on November 19, 2008.

Petitioner then had through November 19, 2009 to file his federal habeas petition. *Downs v. McNeil*, 520 F.3d 1311, 1318 (11th Cir. 2008) (AEDPA's one-year "limitations period should be calculated according to the 'anniversary method,' under which the limitations period expires on the anniversary of the date it began to run.") (citing *Ferreira v. Sec'y, Dep't of Corr.*, 494 F.3d 1286, 1289 n.1 (11th Cir. 2007)).

Petitioner's federal habeas petition was filed on October 23, 2014.   Therefore, it was filed 1799 days late.

### 2. Petitioner has not demonstrated "actual innocence" so as to excuse his failure to comply with the AEDPA's one-year statute of limitation

Petitioner concedes that his § 2254 petition is untimely under the AEDPA, and

does not assert that statutory or equitable tolling should apply.   Rather, Petitioner argues that "*actual innocence* may provide a 'gateway' to allow federal constitutional claims to be heard in a § 2254 proceeding in situations where the petitioner is otherwise procedurally barred by the applicable period of limitations." (Doc. 2 at 24) (citing *McQuiggin v. Perkins*, 133 S. Ct. 1924 (2013)) (emphasis in original).   Indeed, the Supreme Court's recent decision in *McQuiggin*, provides that "actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in *Schlup* [*v. Delo*, 513 U.S. 298 (1995) ] and *House* [*v. Bell*, 547 U.S. 518 (2006) ], or [an] expiration of the [AEDPA] statute of limitations." *Id.* at 1928.

In *Schlup*, the Supreme Court held that a prisoner otherwise subject to procedural bars on the filing of abusive or successive writs of habeas corpus may have his federal constitutional claim considered on the merits if he makes a proper showing of actual innocence. 513 U.S. at 326–27.   "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* at 324. "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id.* at 327. Because this standard is intended to focus the inquiry on actual innocence, "the district court is not bound by the rules of admissibility that would govern at trial." *Id.*   "Instead, the emphasis on 'actual innocence' allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial." *Id.* at 327–28.   Indeed, "[t]he habeas court must make its determination concerning the petitioner's innocence in

light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial." *Id.* at 328 (internal quotations omitted).  "It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do." *Id.* at 329.  "Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id.*[4]

The procedural posture of the instant situation is different than that presented in *McQuiggin*.  McQuiggin pleaded guilty to murder and was sentenced to life in prison. *Perkins v. McQuiggin*, 2009 WL 1788377 (W.D. Mich. June 18, 2009) ("*McQuiggin I*"). McQuiggin obtained three affidavits which he claimed would prove his innocence, yet he waited nearly six years before presenting his newly discovered evidence to <u>any</u> court; in fact, there is no indication that McQuiggin ever presented his actual innocence claim to the state courts. *Id.* at *3.[5]   In contrast, Petitioner's state post-conviction court considered

---

[4] Petitioner did not go to trial in this case.   However, in *Bousley v. United States*, 523 U.S. 614, 623 (1998), the Supreme Court held that the defaulted claim of a petitioner who pleaded guilty may still be reviewed in a collateral proceeding if he can establish that the constitutional error in his plea colloquy has probably resulted in the conviction of one who is "actually innocent" in accord with *Schlup*, 513 U.S. at 327–328, and *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

[5] McQuiggin's failure to timely pursue relief was viewed by the district court as falling "far short of demonstrating the requisite diligence." *McQuiggin I*, 2009 WL 1788377 at *3.   However, the Supreme Court determined that reasonable diligence is not a precondition to relying on actual innocence as a gateway to adjudication of a federal habeas petition on the merits. *McQuiggin*, 133 S. Ct. at 1935.   However, the Supreme Court also rejected the Sixth Circuit's interim conclusion that timing of a petition should

his actual innocence assertion when it was raised in his Rule 3.850 motion as a claim of newly discovered evidence (Ex. 11 at 134-202).[6]   An evidentiary hearing on Petitioner's Rule 3.850 motion was held in state court, and Petitioner presented the testimony of consultant toxicologist Lawrence Masten ("Masten"), psychiatrist Michael Maher ("Maher"), Petitioner, and Petitioner's trial attorney Philadelphia Beard ("Beard").

Toxicologist Masten explained that the FDA's Adverse Event Reporting System ("AERS") was set up to allow people to submit information about adverse effects of specific drugs (EH at 386-87).   He testified that he requested the AERS reports relating to homicidal ideation and homicide correlated with Chantix use and received over 250 reports with seven homicides discussed. *Id.* at 399.   He also discussed an article from *The Annals of Pharmacotherapy*, in which the authors reviewed twenty-six cases of aggression by users of Chantix. *Id.* at 402-04.

Psychiatrist Michael Maher testified that he interviewed Petitioner in preparation for the Rule 3.850 hearing and that he (Petitioner) told him that he had suffered mental illness prior to starting Chantix and that his symptoms increased significantly after he began using the drug, "so in spite of the possibility that he may have been getting side effects from the Chantix, he continued to take it." (EH at 463).   Maher based his opinions

---

be completely eliminated as relevant in evaluating the reliability of a petitioner's proof of innocence.   The Court noted that "[u]nexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing [of actual innocence]." *Id.*

[6] Although this Court concludes that AEDPA deference to the state court's findings on this issue is not required (because the entire purpose of a gateway review is to consider whether the petitioner is entitled to have the federal courts review his claim under the AEDPA), the state court's reasoning and conclusions are helpful when considering whether any juror, "acting reasonably, would have voted to find [Petitioner] guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 329.

on interviews with Petitioner, the police and investigative reports, and on telephone conversations with the victim's mother. *Id.* at 463-65.   Maher testified that he reviewed the available information about Chantix and concluded that "the reports and the series that have been collected absolutely clearly, without doubt establish that there is a vulnerable group of patients who take Chantix who experience completely unpredictable, unprovoked, dramatic and potentially lethal urges of aggression and violence." (EH at 473-74, 478-79).

Petitioner testified at the evidentiary hearing that he had asked his attorney to pursue the Chantix defense at trial but that she concluded that "Chantix wouldn't have caused [him] to kill [his] father." (EH at 506).   Petitioner testified that he was unaware of the studies linking Chantix to homicidal thoughts and that had he been aware of such, he would not have entered a plea. *Id.* at 508

Petitioner's attorney testified that the lowest possible sentence for Petitioner's crimes was more than 23 years in prison and that Petitioner's 15 year sentence was a downward departure (EH at 522).   She testified that she considered both a "straight insanity" defense and an involuntary intoxication defense. *Id.* at 524.   Petitioner was evaluated for both competency and insanity and, although aware of Petitioner's Chanitx use, the psychiatrist did not believe there was a viable insanity defense based upon the circumstances of the case and his evaluation of the defendant. *Id.* at 525.   Counsel did not believe that an insanity or involuntary intoxication defense would work in Petitioner's case because twenty minutes had passed between the argument over Petitioner's theft of money and the altercation in the bedroom, "[s]o there was that time for reflection and time to – it wasn't like an automatic reaction; there was time to reflect." *Id.* at 526.   She

also noted that Petitioner had told the police that an intruder had stabbed his father, indicating a consciousness of guilt. *Id.*   She stated that "generally when those two things happen, even though you can still have a defense, the success of that defense may not be great with the jury hearing those types of facts[.]" *Id.* at 526-27.   Counsel also testified that Petitioner had asked her whether he could just say that his mother, not he, was the person who stabbed his father, but counsel did not "think that that was necessarily a viable defense in this case either." *Id.* at 528.   She stated that, had she been aware of the FDA AERS reports at the time of Petitioner's plea, she may have hired additional experts to look at an involuntary intoxication defense, but still did not believe it would have been a successful defense strategy. *Id.* at 529.

The state court summarized the experts' testimony and rejected Petitioner's claim of actual innocence in a detailed order:

> Defendant argued that newly discovered evidence entitles him to a new trial.   Dr. Masten, a toxicologist, was admitted as an expert in toxicology.   He testified that he evaluated Defendant's case in early 2010 by reviewing Defendant's medical records, prescription records, family statements, and Dr. Maher's report.   The purpose of his evaluation was to look for evidence that one of the prescriptions Defendant was taking, Chantix, may have caused involuntary intoxication in Defendant.   Chantix is a drug produced by Pfizer to block the effects of nicotine on the nervous system, and has been on the market since 2006.   Defendant began taking Chantix on December 11, 2006.   Defendant was also taking several other medications.   Dr. Masten testified that he requested, through the Freedom of Information Act, reports from the Food and Drug Administration's (FDA) Advers Event Reporting System (AERS), regarding Chantix and homicidal thoughts or actions.   These reports are generally reports to the FDA from medical personnel regarding adverse side effects of a medication on a patient, either reported by the patient or observed by the medical personnel.   Dr. Masten stated that he believed he had been the first individual ever to request the AERS reports on Chantix, since there was a significant delay

while the FDA redacted patient information from the reports, and if the reports had been requested previously, these redactions would already have been done.   The AERS reports were made between 2007 and 2010, and show seven homicides and 226 reports of homicidal thoughts allegedly attributed to Chantix.

Dr. Masten stated that at the time of the offense, the known side effects of Chantix were those of nicotine withdrawal, and some reports of suicidal thoughts.   In 2009, however, the FDA placed a black box warning on the label of Chantix, warning that if a patient experiences suicidal thoughts, agitation, or any changes in behavior not typical of nicotine withdrawal, to stop taking the drug at once and seek medical attention.   Dr. Masten said that some of the AERS warnings indicated inexplicable or unprovoked acts of aggression.   A peer reviewed article published in 2010 linked Chantix use with homicide, aggression, and violence.   He found no other published articles about Chantix prior to this 2010 article.   Dr. Masten testified that prior to 2006, these side effects would not have been known to toxicologists.   He was not aware of any other medications which would cause homicidal thoughts or unpredicted, uncontrollable, rage.   Dr. Masten stated that, at the time Defendant pled, only the first AERS report dated January 15, 2008 relating to homicidal thoughts and actions had been field by the FDA, and the next two reports filed in October of 2008 would not have been available by the plea date even if they had been requested.

Dr. Masten believed there was a real possibility that Chantix could cause homicidal thoughts in a percentage of people taking it.   He testified that the dosage of Chantix prescribed to Defendant exceeded the recommended dosage, and Defendant was not monitored by his doctor while taking Chantix.   Based on Defendant's records and the AERS reports, he believed that there was a very high probability that Chantix caused Defendant to kill his father.   Dr. Masten opined that Defendant was legally insane at the time of the crime due to involuntary intoxication from the adverse effects of Chantix.

Dr. Maher, a psychiatrist and physician, was admitted as an expert in forensic psychiatry.   He testified that he reviewed police reports, interviewed Defendant's mother at least three times, interviewed Defendant, researched medication issues, and reviewed Defendant's medical and medication records. His interview with Defendant lasted about two and a half

hours, and involved a psychiatric evaluation and interview. Dr. Maher related that Defendant reported to him being depressed prior to the offense upset, anxious, and worried about his illness and having to move back into his parents' home to recuperate.   Defendant reported confusion at times, and feeling disconnected from what was happening around him, and that these feelings increased after he started taking Chantix.   Defendant told Dr. Maher during his interview that he believed he had unrealistic emotions and pessimism. Defendant allegedly reported some irritability to his doctor. Dr. Maher stated he corroborated Defendant's statements with police reports and through speaking with Defendant's mother.

Dr. Maher testified that he believed that there is a group of vulnerable patients in which Chantix causes sometimes lethal aggressive behavior.   It was his opinion that in that vulnerable population Chantix can cause homicidal thoughts, inexplicable, unprovoked violent acts, and uncontrollable rage.   He believed that the disconnected feeling and other symptoms described by Defendant are a very strong clue that Defendant may be among that vulnerable population.   None of the other medications Defendant was taking would cause uncontrollable rage or homicidal thoughts or actions.   These symptoms were unique to Chantix.   Dr. Maher testified that it was his opinion that Defendant did not have the capacity to understand the consequences of his actions, or that his actions were wrong, and that Defendant was involuntarily intoxicated at the time of the offense due to Chantix.

To obtain a new trial based on newly discovered evidence, a defendant must show that the evidence was not known by the trial court, the party, or counsel at the time of trial, that the defendant or defense counsel could not have known of it by the use of due diligence, and that the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial. Preston v. State, 970 So. 2d 789, 797 (Fla. 2007), citing Jones v. State, 709 So. 2d 512, 521 (Fla. 1998).   When claiming that newly discovered evidence would have affected the plea process, a defendant must allege that withdrawal of their plea is necessary to correct a manifest injustice.   See Bradford v. State, 869 So. 2d 28, 29 (Fla. 2d DCA 2004); Deck v. State, 985 So. 2d 1234, 1237 (Fla. 2d DCA 2008). The burden of proving manifest injustice is on the Defendant. Scott v. State, 629 So. 2d 888, 890 (Fla. 4th DCA 1993).

FDA warnings and evidence of drug side effects have been found to be newly discovered evidence in Florida. *See* Brancaccio v. State, 27 So. 3d 739 (Fla. 4th DCA 2010).   Trial counsel, Ms. Beard, testified she was unaware of the existence of AERS reports until the filing of the 3.850 motion, so this evidence of the side effects of Chantix was unknown to her at the time of the plea.   Defendant testified that these side effects were unknown to him at the time of the plea. Regardless of whether the AERS reports in this case could have been discovered with due diligence, Defendant has failed to meet his burden of proving manifest injustice. Neither party has argued the admissibility of the reports had they been introduced at a trial in this case.   No relief is warranted if the evidence would be inadmissible. Miller v. State, 814 So. 2d 1131 (Fla. 5th DCA 2002), *citing* Sims v. State, 754 So. 2d 657, 660 (Fla. 2000).   While Defendant presented evidence of reports that Chantix has caused homicidal thoughts or actions in others, he presented no evidence, other than self-reporting to Dr. Maher during the post-conviction proceedings, that Defendant suffered from those side effects at the time of the offense. Nor did Defendant present any evidence that he had no prior history of such behavior before taking Chantix.   Rather there was testimony that some of the side effects, such as depression, confusion and disconnect, occurred before the Defendant began taking Chantix.   Further, Ms. Beard testified there were problems with the facts of the case that would tend towards a finding of premeditation, as the offense occurred twenty minutes following Defendant's altercation with his father.   She also related that Defendant's statement to 911 that someone must have broken in and killed his father, and a statement to her asking whether they could blame the murder on his mother, were problematic, as they would tend to indicate guilty.   Even if Defendant were allowed to withdraw his plea, and the case proceeded to trial, it does not appear that the AERS reports alone, if admissible at trial, would probably produce an acquittal in light of the problems that Ms. Beard testified existed in this case.   The facts of the case, the evidence, and the evidentiary hearing testimony do not support a conclusion that withdrawal of the plea is necessary to correct a manifest injustice.

(Ex. 11a at 358-62).   The post-conviction court's adjudication was affirmed on appeal

(Ex. 15).   Petitioner does not argue with the post-conviction court's evaluation or

conclusions.   Rather, he provides this Court with additional evidence consisting of: an

affidavit from Petitioner's mother; the transcript of a June 10, 2008 pre-trial evidentiary hearing; affidavits from Masten dated November 11, 2010 and July 7, 2014; the transcript of the Rule 3.850 evidentiary hearing; an article from *The Annals of Pharmacotherapy*; a competency evaluation report from August 13, 2014; and Petitioner's Lee County Jail medical records (Petitioner's Exhibits A-I).[7]

Petitioner's mother attests that, in the month prior to stabbing his father, Petitioner acted oddly and had become silent and withdrawn (Petitioner's Exhibit A).   She requested additional AER reports from the FDA on Chantix for the time periods between August of 2006 and June of 2014, and found 25 reports of homicide and 826 reports of homicide ideation listed as an adverse reaction to Chantix.[8]

In his November 11, 2010 affidavit (Petitioner's Exhibit C), Masten attests that he requested the FDA to provide copies of reports from their Adverse Event Reporting System ("AERS") on Chantix for homicide and homicidal ideation. *Id.* at 39.[9]   He reviewed 234 AERS reports and found seven homicides associated with Chantix. *Id.*   He also noted that Petitioner had not been "gradually introduced" to his Chantix dosage over

---

[7] The last two exhibits support Petitioner's habeas claims, not the actual innocence claim.

[8] Mrs. Prendergast also attests that she spoke personally with the FDA Paralegal Specialist, Office of Regulatory Policy, Division of Information Disclosure Policy, who assured her that all of her requests had to be redacted, and that she understood this to mean that no one had ever requested this information for the specific time frames requested (Petitioner's Exhibit A at 3).   Given that Masten also attests that he requested much of the same information (prior to Mrs. Prendergast's request), which also had to be redacted, the Court concludes that Mrs. Prendergast is mistaken in her assumption that the necessity for redaction means that the information has never been requested.

[9] Although Masten attests that he asked for the AERS reports on homicide and homicidal ideation, his request actually sought "suicidal ideation, homicidal ideation, and homicide." (Petitioner's Exhibit C).

a week as recommended by Pfizer, the drug manufacturer, but was immediately started on 1 milligram twice daily. *Id.* at 36, 42.   Masten attests that Petitioner told him that he experienced suicidal thoughts and strange impulsive behavior without any reason just days before he killed his father. *Id.* at 42.   Masten concluded:

> [W]ithin reasonable scientific certainty, it is highly likely that the Chantix program Mr. Prendergast participated in, for two and a half months, **played a major role in or was responsible for causing** Mr. Prendergast to injure and kill his father, based on the AERS reports submitted to FDA for this drug, including seven homicides and at least 226 reports of homicidal ideation, aggressive behavior and abnormal dreams while taking Chantix alone or with a variety of drugs used to treat anxiety and depression and lessen pain.

(Petitioner's Exhibit C at 44) (emphasis in original).   Masten provided an updated affidavit on July 7, 2014 in which he attests that there were 17 reports of homicide and 795 reports of homicidal ideation related to Chantix and its European equivalent Champix between August of 2006 and May of 2012 (Petitioner's Exhibit F at 2-3).   Masten also summarized a 2010 observational study published in the online *Annals of Pharmacotherapy* entitled "Thoughts and Acts of Aggression Violence Towards Others Reported in Association with Varenicline."[10] *Id.*   Masten noted that the study concluded that "a clear temporal relationship, lack of prior history of this behavior, and unusual nature of these events strengthens the accumulating scientific evidence that varenicline (Chantix) is associated with thoughts and acts of aggression/violence." *Id.* at 5.   Masten concluded that "it is highly likely that Chantix use can lead to homicidal ideations and homicidal actions in people who use it." *Id.* at 6.

---

[10] Thomas J. Moore, Joseph Glenmullen, and Curt D. Furberg. This is the same study discussed at Petitioner's evidentiary hearing.

Petitioner attaches a copy of the *Pharmacotherapy* article to his petition.   The article, which reviewed 26 cases that identified Chantix as suspect in causing violence or aggression, concluded that Chantix aggression may occur in "a relatively small and susceptible population that is affected early." (Petitioner's Exhibit E).   The paper did not identify the characteristics of a person who may exhibit aggression as a result of Chantix use, but concluded that "a well-designed case-controlled study appears to be the most feasible approach" to identify patients vulnerable to the syndrome. *Id.*

After reviewing the evidence presented at the Rule 3.850 evidentiary hearing as well as the additional evidence presented by Petitioner, the Court is not persuaded that no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.   Under Florida law, "[a]n accused may be completely relieved of criminal responsibility if because of involuntary intoxication, he was temporarily rendered legally insane at the time he committed the offense." *Brancaccio v. State*, 27 So. 3d 739, 740-41 (Fla. 4th DCA 2010).   In order to establish an involuntary intoxication defense, a defendant must first present sufficient evidence that an intoxicated condition was brought about by the introduction into the defendant's body "of any substance which he does not know and has no reason to know has a tendency to cause an intoxicated or drugged condition." *Brancaccio v. State*, 698 So.2d597, 600 n. 4 (Fla. 4th DCA 1997). The defendant would then have the burden to prove that this involuntary intoxication rendered him unable to understand what he was doing and to understand the consequences of his actions, or if he did understand, that he was unable to know that his actions were wrong. *See generally Hall v. State*, 568 So.2d 882 (Fla. 1990).   "If a defendant introduces evidence sufficient to present a reasonable doubt about sanity, the presumption of sanity

vanishes and the state must prove the accused's sanity beyond a reasonable doubt." *Id.* at 885 n. 6.

The additional evidence presented in the instant petition -- that isolated incidences of violence associated with Chantix continue to occur – is merely cumulative to the evidence already considered and rejected by the state court in Petitioner's Rule 3.850 motion.   Notably absent from the instant petition is any statistical analyses regarding the population's overall use of Chantix; the frequency of Chantix-induced homicidal activity in the population of users as compared to the population of people who attempt to quit smoking without the aid of Chantix; or any evidence that Petitioner is a member of the population that could be affected by Chantix.[11]   In essence, even if a reasonable juror

---

[11] The Court takes judicial notice of information available on the United States Food and Drug Administration's ("FDA's") website that appears to contradict Petitioner's instant claims. *See Stanifer v. Corin USA Ltd. Inc.*, Case No. 614-cv-1192-Orl-37DAB, 2014 WL 5823319, at *3 (M.D. Fla Nov. 10, 2014) ("Courts in this District and elsewhere regularly take judicial notice of public records available on the FDA's website because such document[s] satisfy the requirements of Rule 201."); *Kaiser v. Depuy Spine, Inc.*, 944 F. Supp. 2d 1187, 1189 n. 2 (M.D. Fla. 2013) (taking judicial notice of "public records of the FDA relating to the medical device involved in the case"); *Chapman v. Abbott Labs.*, 930 F.Supp.2d 1321, 1323 (M.D. Fla. 2013) (taking judicial notice of drug label that was "available on the FDA's website").

The website summarizes studies done on the neuropsychiatric adverse events associated with varenicline (the generic name of Chantix).   The results did not conclude that Chantix caused suicidal or homicidal activity in its users; instead the FDA noted that a pooled analysis of 18 randomized, double-blind, placebo-controlled clinical trials, "showed a similar incidence of common psychiatric events in patients treated with Chantix compared to patients treated with placebo."   The FDA also discussed four observational studies, each including 10,000 to 30,000 Chantix users compared to users of other prescription smoking cessation methods.   Recognizing that these studies had certain limitations, the FDA noted that two of the studies found no difference in risk of neuropsychiatric hospitalizations between users of Chantix and the nicotine patch; a third study reported no difference in risk of psychiatric adverse events diagnosed during an emergency department visit or inpatient admission between users of Chantix and bupropion; and a fourth study concluded that the suicide rate among Chantix users was similar to that of users of other prescription nicotine replacement therapy. http://www.fda.gov/Drugs/DrugSafety/ucm436494.htm

could find that Chantix rage exists, Petitioner has presented no evidence that <u>he</u> was so affected.

As noted by Petitioner's attorney, Petitioner's statement to the 9-1-1 operator that someone had broken into his home and stabbed his father is damaging to his current claim of involuntary intoxication.   A reasonable juror could reject Petitioner's involuntary intoxication defense on that ground alone -- either by concluding that Petitioner's attempt to mislead the police negated his claim that he was unable to understand the consequences of his action, or by finding that his attempt to do so supported the state's assertion that Petitioner was sane at the time of the stabbing. *Hall v. State*, 568 So.2d 882 (Fla. 1990).   Also troubling is Petitioner's question to his attorney as to whether he could escape prosecution by blaming his mother for the attack.[12]

Moreover, even if the defense was able to convince the jury that Chantix rage exists and overcome the presumption of sanity, Petitioner has not demonstrated that the state could not prove Petitioner's sanity beyond a reasonable doubt. While additional evidence that some Chantix users committed homicide has surfaced subsequent to Petitioner's plea, "Chantix rage" was considered and rejected as a possible defense by his defense attorney prior to his plea.   Petitioner testified that Beard had initially been interested in pursuing the Chantix defense, but after speaking with a toxicologist, concluded that Chantix would not have caused Petitioner to kill his father (EH at 506). Defense counsel testified that Petitioner's psychiatrist did not think a Chantix defense

---

[12] The standard under *Schlup* requires this Court to survey "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *See House v. Bell*, 547 U.S. 518, 538 (2006).

would be successful in Petitioner's case.   Given that Petitioner's toxicologist and psychologist rejected the defense, it is logical that the state would present their own experts to refute any evidence of Chantix' effect on Petitioner.   Moreover, the results of the summaries contained in the FDA website cast doubt on the existence of Chantix-induced neuropsychiatric adverse events.   Finally, at his sentencing hearing, Petitioner's sister testified that she believed Petitioner "has been like this his whole life.   This was not an isolated incident.   This was his pattern for many years." (Ex. 11a at 287).

Accordingly, Petitioner has failed to demonstrate that <u>no</u> reasonable juror considering Petitioner's new evidence, could conclude that Petitioner was sane at the time he killed his father.    Petitioner has failed to satisfy *McQuiggin's* actual innocence exception to the AEDPA statute of limitation, and this petition must be dismissed as untimely.

### B.    Petitioner has not demonstrated entitlement to habeas relief

Even assuming *arguendo* that Plaintiff presented sufficient evidence of actual innocence to open a gateway to habeas review, and that the same showing excuses his failure to exhaust his claims in state court, he is not entitled to federal habeas relief.   *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State).

In his first habeas claim, Petitioner asserts that defense counsel was ineffective for failing to "have [Petitioner] evaluated for competency to enter his plea and be sentenced." (Doc. 2 at 31).   Petitioner claims that he was "severely hyperthyroidal" prior to his plea, "and that said hyperthyroid condition could have also detrimentally affect [his]

competency to proceed." *Id.* at 33.   In his second claim, he asserts that he was deprived of his constitutional due process rights because he was convicted and sentenced while incompetent. *Id.* at 37.

A guilty plea made while the defendant is mentally incompetent is constitutionally invalid, and the standard of competency for pleading guilty is the same as the standard for standing trial. *Godinez v. Moran*, 509 U.S. 389, 396–97 (1993).   A defendant is competent to stand trial if he possesses: (1) sufficient present ability to consult with his attorney with a reasonable degree of rational understanding; and (2) a rational and factual understanding of the proceedings against him. *Dusky v. United States*, 362 U.S. 402 (1960); Fla. R. Crim. P. 3.211(a)(1).   A court is not required to make a competency determination in every case where a defendant enters a plea.   Rather, a competency determination is necessary only when a court has reason to doubt the defendant's competence. *See Drope v. Missouri*, 420 U.S. 162, 180-81 (1975) ("the failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial."); *Pate v. Robinson*, 383 U.S. 375, 385 (1966) (A trial judge must conduct a *sua sponte* sanity hearing only when the defendant's conduct and the evidence raises a "bona fide doubt" regarding the defendant's competence to stand trial.).   Therefore, in a *Pate* claim raised on habeas review, a petitioner must establish that the state trial judge ignored facts raising a "bona fide doubt" regarding the petitioner's competence to stand trial." *James v. Singletary*, 957 F.2d 1562, 1572 n. 15 (11th Cir. 1992).   Although there are "no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed," "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant." *Drope*, 420 U.S. at 180.

In his Rule 3.850 motion, Petitioner did not assert that he was incompetent to enter a plea, and this was not an issue at the evidentiary hearing on the motion.   Rather, the focus of the motion was that Chantix rendered him legally insane at the time he killed his father.   Nevertheless, Beard testified that she had no doubts about Petitioner's competency to enter a plea and no doubts as to whether he understood the terms of the plea agreement (EH at 533).   She stated that "if I had thought he was incompetent, I would have, um – wouldn't have gone forward." *Id.*   Beard also testified that she had Petitioner evaluated by a psychiatrist twice before his plea.

Petitioner's assertion that "Attorney Beard admitted that she did not seek a competency determination," is directly contradicted by the record (Doc. 2 at 33).   On cross-examination, defense counsel sought to establish that Beard had not had Petitioner properly examined for a potential insanity defense by proving that the two psychiatrist visits had been solely to determine whether he was competent to proceed. Beard denied the allegations, noting:

> I asked when – when I talked – no, **it wasn't only for competency**.   It was for, um, insanity at the time of the offense, specifically.   If it had been competency, I would have had the court pay for it.   He was a confidential doctor for the defense only.   And when I asked him to go out there – **I always ask them to check for competency**, but I um – he was specifically set to go out there because I didn't really have any concerns about, um, Mr. Pendergast's competency. Um, I was looking for defenses.

(EH at 536-37) (emphases added).   Defense counsel challenged Beard's assertion that the psychiatrist had done more than a mere competency exam by noting that the bill from the psychiatrist said "forensic competency evaluation." *Id.* at 539.   Given Beard's assertion that the psychiatric evaluations included competency evaluations and the resulting bills for "forensic competency evaluations," Petitioner's current claim that Beard

failed to have Petitioner evaluated for competency, which directly contradicts his prior claim that counsel had him examined *only* for competency, demonstrates a disturbing lack of probity.   Under the two-part test for ineffective assistance of counsel set out in *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), Petitioner must establish that counsel's performance was deficient and fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense. *Id.*   Because the record shows that Beard had Petitioner's competency evaluated prior to his plea, she could not be deficient for failing to do so.   Petitioner has failed to satisfy the first *Strickland* prong on Claim One.

Likewise, even had counsel failed to have a competency exam conducted, the record before this Court does not approach the threshold of showing a bona fide doubt about Petitioner's capacity to plead guilty.   At the plea colloquy, Petitioner denied that he suffered from a mental condition that affected his understanding of the plea (Ex. 11a at 293)   Petitioner affirmed his understanding of the rights he was giving up by pleading. *Id.* at 293-95.   He affirmed his understanding of what was discussed with counsel and agreed that she had done everything asked of her. *Id.* at 297.   Petitioner told the court that he believed the plea to be in his best interest. *Id.* at 2905.   After the factual basis for the plea was read into the record, Petitioner was asked if he had any questions, and Petitioner stated that he did not. *Id.* at 298.   Petitioner did not demonstrate irrational behavior or an improper demeanor at the colloquy.   Nothing in the record would have alerted the state court or counsel to the possibility that Petitioner did not possess a rational understanding of the proceedings against him.

This conclusion is supported by Petitioner's testimony at the evidentiary hearing

on his Rule 3.850 motion. Petitioner testified that a psychiatrist met with him on two separate occasions, and he believed the doctor was hired to give a competency evaluation and a second competency evaluation. *Id.* at 498.   At no time did Petitioner state, argue, or imply that he lacked the competency to enter a plea or that the plea was improvidently entered due to his incompetence.     To the contrary, when questioned by collateral counsel, Petitioner testified that, given Beard's reluctance to pursue an involuntary intoxication defense, he believed that entering a plea was in his best interests. *Id.* at 508.

> Q. After you were told that you did not have an involuntary intoxication defense, what other defenses did you believe were available to you if you were to go to trial?
>
> A. Uh, there was none – no other defense that was ever discussed with Miss Beard and myself and my mother than the involuntary intoxication.
>
> Q. Okay, at the time of your plea, had you been aware that there are now expert opinions and proof that Chantix can cause homicidal actions, what would your decision have been with regard to the entry of your nolo contendere plea?
>
> A. Oh, I wouldn't have entered that plea.   Absolutely not.
>
> Q. If you would have had testimony such as that we heard from Dr. Maher and Dr. Masten today, how would that have affected your decision to enter the plea?
>
> A. Oh, that would have entirely affected my decision.  I wouldn't have taken any plea at that time.   Uh, with all this evidence that has been uncovered in the post-conviction investigation, I most definitely would have elected to take my case to trial.   There's no question about that.

(EH at 508-09).   The record before this Court does not suggest that Petitioner was incompetent to enter his plea.   Furthermore, although Petitioner now argues that his

hyperthyroidism and diagnoses of psychosis prior to his plea raise a substantial doubt as to his competency to stand trial, he shows nothing to indicate that he lacked the "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and lacked "a rational as well as factual understanding of the proceedings against him." *Dusky*, 362 U.S. at 402. Accordingly, even if Claim Two was timely filed, it would not present a constitutional claim under *Pate*, *Drope*, or *Dusky*.

Any of Petitioner's allegations not specifically addressed herein have been found to be without merit.

## IV.  Certificate of Appealability[13]

Petitioner is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability ("COA"). "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, Petitioner must demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller–El v. Cockrell*, 537 U.S. 322, 335–36 (2003). Petitioner has not made the requisite showing in these circumstances.

---

[13] Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Id. As this Court has determined that Petitioner is not entitled to habeas corpus relief, it must now consider whether Petitioner is entitled to a certificate of appealability.

Because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1.     The Florida Attorney General is **DISMISSED** as a named Respondent.

2.     The petition for writ of habeas corpus filed by Timothy Michael Prendergast is **DISMISSED WITH PREJUDICE** as time-barred.   Alternatively, the claims raised in the petition are **DENIED**.

3.     Petitioner is **DENIED** a certificate of appealability.

4.     The Clerk of Court is directed to terminate any pending motions, enter judgment accordingly, and close this case.

**DONE** and **ORDERED** in Fort Myers, Florida on this 24th day of November, 2015.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

SA: OrlP-4
Copies: All Parties of Record